94 N.J. Super. 359 (1967)
228 A.2d 359
KENNETH R. FISHER, PLAINTIFF,
v.
BOARD OF EDUCATION, UNION TOWNSHIP, UNION COUNTY, NEW JERSEY, DEFENDANT, MECHANICAL CONTRACTORS ASSOCIATION OF NEW JERSEY, INC., A NONPROFIT NEW JERSEY CORPORATION, DEFENDANT-INTERVENOR.
Superior Court of New Jersey, Chancery Division.
Decided March 2, 1967.
*362 Mr. Adrian M. Foley for plaintiff (Mr. Kenneth F. Kunzman on the brief; Messrs. Pindar, McElroy, Connell & Foley, and Mr. Joseph C. Glavin, attorneys).
Mr. Howard Schwartz for defendant (Mr. Harrison B. Johnson, attorney).
Mr. Kenneth L. Estabrook for defendant-intervenor (Mr. James D. Coffee on the brief; Messrs. Lindabury, McCormick & Estabrook, attorneys).
MINTZ, J.S.C.
This is a taxpayer's suit wherein it is alleged that the Union Township Board of Education (hereinafter referred to as the "board"), violated the provisions of the separate bid statute, N.J.S.A. 18:11-10, applicable to school construction, when it amended its specifications for the additions and alterations to Burnet Junior High School.
Original specifications were prepared for the board in August 1966 by the engineering firm of Morrison, Zimmer and Borton, in conjunction with the architectural firm of Elsasser and Miller. Since the existing school buildings were steam and hot water heated and because the existing boiler capacity was not fully utilized, a portion of the proposed additional building was to be steam heated. The balance of the addition, namely, the south wing, was to be electrically heated. It is only the electrically heated portion of the proposed school addition with which the court is presently concerned.
The original specifications for the south wing provided for the supply and installation of the following heating and ventilating apparatus: unit heaters, cabinet heaters, convectors, sill line radiation, electric duct heaters, unit ventilators (packaged syncretizers), large volume air handling units, roof fans, roof ventilators, air conditioning units, and automatic temperature controls. All of the above equipment was to be electrically energized. However, all of the equipment was pre-packaged, i.e., all of the internal wiring was performed by *363 the manufacturers of the specific units, and the only work to be done on the job site was the physical installation of the pre-wired unit and the attaching of the power wiring to the unit from the source of the electrical energy.
The original specifications established three categories for separate bids for the heating and ventilating equipment: (a) ventilating and air conditioning, (b) heating and automatic temperature control, and (c) electrical, heating and automatic temperature control, which included the external field wiring for all of the equipment. These categories were established allegedly pursuant to N.J.S.A. 18:11-10 which provides:
"In the erection, construction, alteration or repair of a public school building, when the entire cost of the work will exceed two thousand dollars ($2,000.00) in amount, the board of education shall, in the manner provided by law, advertise for and receive separate bids for the plumbing and gas fitting, and all work kindred thereto, the steam and hot water heating and ventilating apparatus, steam power plants and all work kindred thereto, and electrical work, structural steel and ornamental iron work. The board shall award contracts for such work to the lowest responsible bidder for each of such branches respectively."
The original specifications allocated the heating and ventilating equipment to the various categories as follows:
 Ventlating and Air Conditioning
 Large volume air handling units
 Roof fans
 Roof ventilators
 Air conditioning
 TX Syncretizer systems
 Electrical, Heating and Automatic Temperature Control
 Unit heaters
 Cabinet heaters
 Convectors
 Sill line radiation
 Electric duct heaters
 Unit ventilators
 Automatic temperature controls
*364 The large volume air handling units, the TX Syncretizers and all of the items in the latter category, with the exception of the automatic temperature controls, are to be furnished by either ITT Nesbitt Co. or Herman Nelson Co.
On November 15, 1966 the architects Elsasser and Miller by letter notified all prospective bidders that the ventilating and air conditioning category would be deleted from the original specifications, and that the items and work to be performed in that category would be included in the heating and automatic temperature control category. The notice stated that:
"The expanded Heating & Automatic Temperature Control Division will also incorporate all heating devices and related controls heretofore included under the Electrical, Heating and Automatic Temperature Control Work."
Pursuant to this letter, Addendum Bulletin Number 2, dated November 18, 1966, was issued reflecting this change in the specifications. Consequently, all heating and automatic temperature control work was removed from the electrical category and included in the expanded category entitled, "Heating, Ventilating, Air Conditioning & Automatic Temperature Control Work." "Electric Work" became a separate category. The amended specification in issue retains as a part of the "Electrical Work" the field power wiring to the equipment in dispute. The parties agree that such work should be performed by the electrical contractor.
The change in the specifications was made upon directions by the board after it received a legal opinion that the original specifications violated N.J.S.A. 18:11-10, the separate bid statute. Counsel was of the opinion that all heating and ventilating equipment must be bid in one category notwithstanding the source of energy.
Plaintiff taxpayer, who apparently is bringing this action on behalf of the New Jersey Chapter of the National Electrical Contractors Association of New Jersey, contends that the heating and ventilating equipment, designated in the original *365 specifications under "Electrical, Heating & Automatic Temperature Control," is purely electrical in design, utility and operation and thus should be bid exclusively as electrical work within the "plain meaning" of the separate bid statute. Defendant intervenor asserts that the supply and installation of the afore-mentioned equipment is properly categorized as per the revised specifications.
A statute clear and unambiguous on its face need not and cannot be interpreted by a court; only those statutes which are ambiguous and of doubtful meaning are subject to the processes of statutory interpretation. State v. Mundet Cork Corp., 8 N.J. 359 (1952); Vroom v. Smith, 14 N.J.L. 479 (Sup. Ct. 1834). The statute here under consideration, when applied to the facts, provides sufficient ambiguity so as to require judicial construction. The statute directs that "steam and hot water heating and ventilating apparatus, steam power plant and all work kindred thereto" be separately bid; and likewise there are to be separate bids for all "Electrical Work." Do the adjectives "steam and hot water" modify "ventilating apparatus" as well as "heating"; and if a combination electrical heating and ventilation system is to be supplied, is the bid for the supply and installation of that equipment to be included in the "Electrical Work"?
A sensible reading of the statute precludes the adjectives "steam and hot water" from modifying the words "ventilating apparatus." Ventilation, according to the testimony of all expert witnesses, is the process of supplying or removing air by natural or mechanical means to or from any space. The "Guide For Schoolhouse Planning and Construction," compiled by the State Board of Education, pursuant to the authority vested in it by N.J.S.A. 18:2-4, provides that all schools must be equipped with a mechanical system of supply ventilation so that all classrooms and other rooms will obtain a specific quantity of tempered outdoor air per minute. "Ventilation apparatus," therefore, is that equipment which facilitates the requisite air changes and supply of outdoor air. When the Legislature used the words "steam *366 and hot water" it was describing the then popular methods of producing heat, rather than the separate function of ventilation. In other words, ventilation is the process of bringing outside air into a space and circulating it, while heating is the process of tempering or conditioning that air. The functions, though related, are separate. Presumably, the Legislature intended a category which included ventilation apparatus as well as steam and hot water heating, power plants and all work kindred thereto.
This determination serves, however, to compound the problem. The equipment to be supplied under the proposed heating, ventilating, air conditioning and automatic temperature control category performs, in most instances, the dual functions of heating and ventilating. Some of the equipment also contains air cooling units. It apparently was the intention of the designers of the addition to the school to have an integrated system of air tempering units functioning either individually or collectively to provide a constant source of ventilation and to maintain comfortable room temperatures and conditions. However, said equipment is electrically energized. Herein lies the problem.
The legislative history of N.J.S.A. 18:11-10 is not helpful in resolving the dispute. This statute is one of three (see, also, R.S. 40:9-3 and R.S. 52:32-2) originally enacted in 1915 to provide for separate bids in public construction. The provisions in each are basically the same as those in the present statutes. The statute here in question, applicable to public school construction, was amended in 1931 to provide the additional category of "structural steel and ornamental iron work"; also, the contractual limit of $1,000 was raised to $50,000. The statute was again amended in the same year to reduce the contractual limit from $50,000 back to $1,000. When the New Jersey statutes were revised in 1937, the predecessor of N.J.S.A. 18:11-10 was enacted. In 1953 the statute was amended to increase the contractual limit from $1,000 to $2,000. Though the statute was reenacted and amended, the Legislature apparently did not take into consideration *367 the recent technological advances in electrical comfort air conditioning. Thus, the form as originally enacted in 1915 basically was retained.
In trying to conform relatively new technological concepts to language originally formulated in 1915, the court must look to the general purpose of the separate bid statute. In Weinacht v. Board of Chosen Freeholders, 3 N.J. 330 (1949), the court indicated that the primary objective of the separate bid statute before it was to encourage competition to benefit the public. It was felt that by broadening competition, economies in construction would be effected through the use of separate bids. It is apparent, therefore, that any interpretation of N.J.S.A. 18:11-10 must be governed primarily by the economies to be derived in favor of the public body. A further pertinent inquiry concerns the nature of the work required to install and test the equipment in order to determine whether the task is predominantly "electrical" or "mechanical."
Clifford Zimmer, the mechanical engineer who wrote the original specifications, was of the firm professional opinion that the heating and ventilating work would be accomplished more efficiently and economically if the equipment was supplied and installed by the electrical contractor. Zimmer testified that he placed the work in the electrical category because he wanted singular responsibility, i.e., he wanted the external field wiring and the installation of the units to be performed by the same contractor, so that in the event of a deficiency in the system the board could look to one contractor to correct the work. He pointed out that each contractor is required to guarantee materials and workmanship against original defects for a period of one year, and that the guaranty is covered by a surety bond. He objected to a division of responsibility and a division of the guaranty. He said that a division of the work would cause an increase in the cost of the job. However, he did not explain how or why there would be such an increase in cost.
*368 Finally, Zimmer indicated that he prepared the mechanical specifications for a number of public school facilities in the recent past, and in those schools in which electrical heating was specified he placed heating and ventilating work similar to that in the instant case in the electrical category. Zimmer opined that the predominant work to be performed in the installation of the equipment is electrical. This, coupled with his desire not to divide responsibility, prompted his decision, and he objected to the change in the specifications.
Frederick A. Elsasser, the architect retained by the board, testified that the segregation of the work as set forth in the original specifications met with his approval. He was of the view that the original delineation of work was both economical and efficient.
Zimmer's testimony was sharply rebutted by the testimony of Joseph Biro, a licensed professional engineer of New Jersey. Biro, who also has prepared specifications for the construction of many public schools, indicated that initially he placed electrical heating and ventilating equipment in the electrical contract. However, since 1965 he is providing for the supply and installation of this equipment in the heating and ventilating contract. This change was made by Biro because he experienced difficulty with electrical contractors in performing the work. He stated that they lacked experience in getting prices for heating supplies, and in coordinating the arrival of materials. He said that the electrical contractor has no experience in the hanging of large units. He indicated that a salient factor which prompted his decision was the integration of electrical heating with air conditioning. This combination of work and equipment, in his judgment, should go to the mechanical contractor. He observed that the allocation of this equipment to the heating section did not preclude electrical contractors from bidding for the furnishing and installation of the same.
Carl Don Carlson, chief architect for the firm of Emil Schmidlin, testified that in 1965 his firm was the architect *369 for the construction of a totally electrically heated school building in the Borough of Mendham in Morris County. The furnishing and installation of the electrical heating and ventilating equipment were assigned to the heating and ventilation category, and the field power wiring to the "Electrical Work" category  precisely the same allocation as is presently proposed by the defendant. Carlson said he made this delineation because electrical contractors are not familiar with the installation of many of the components of the heating equipment. He emphasized the fact that the heating element is installed at the factory, whether it be hot water, steam heat, or electric. He stated that the basic work involved in the installation on site is mechanical, and, finally, that the units have to be balanced to produce the proper amount of air. This is work that should be performed under the category of heating and ventilating.
William McCloskey, an engineer with the ITT Nesbitt Co., a proposed supplier of the heating and ventilating equipment, testified that the installation of the units would be basically the same whether they be energized electrically, by steam or by hot water. The only difference would be the necessity of electrical connections, which, as already noted, is conceded to be properly in the electrical contract. McCloskey proceeded to delineate the steps to be carried out in the installation of the Nesbitt PKG Syncretizer (unit ventilator). A perusal of the installation instructions introduced into evidence, together with Mr. McCloskey's testimony, clearly indicates that the installation work is predominantly mechanical. There is sheet metal work to be performed, with wall sleeves and an outdoor air plenum to be installed. A louver is to be attached and a louver frame installed. The unit itself must be leveled, set and then bolted to the wall. If an air conditioning section is to be furnished as part of the package syncretizer, then the same must be mechanically installed into the wall sleeve provided for in the unit. Valves must then be connected and the connections tested. Significantly, the *370 "installation instructions" for the unit ventilator refer to electrical connections as follows:
"(E) Attach electrical wiring.
(a) Connect power wiring to line side of circuit breaker in disconnect terminal box in left hand end compartment of unit ventilator. This is the only electrical connection required to the PKG Syncretizer." (Emphasis added)
The electrical work, therefore, by the very directions of the manufacturer of the unit, is only a minor segment of the complete installation.
It may be observed that in the original specifications undisturbed by the amendment thereto, the TX Syncretizer units were made a part of the ventilation contract. Significantly, plaintiff makes no objection to this allocation in the amended specifications. However, these units, which are electrically energized, are similar to the unit ventilators (package syncretizers), except that the compressor and air cooled condenser comprising the air conditioning section are remote from the rest of the unit, and tubing is required to make the connection. Additionally, six large air handling units (thermovents), to be ceiling hung are specified for the shop wing in the north addition. They are electrically energized and designed to heat and ventilate large interiors, and likewise, without objection from plaintiff, allocated to heating and ventilation. And, as already noted, the kitchen equipment, electrically energized, is the subject of a separate contract without objection from plaintiff. Clearly, then, the fact that the equipment is electrically energized is not controlling in determining the category to which it should be assigned. Rather, an important factor is the nature and service of the work to be performed in installing these "package" or factory prefabricated units. I am of the view that the preponderance of the evidence is to the effect that the prepominant work in the installation of the equipment involved is mechanical. As already observed, the parties agree that the field power wiring *371 and electrical connections are to be made by the electrical contractor.
In the final analysis, we are here concerned with the installation of a system which includes not only ventilation (both supply of air to and removal of air from a school building) but also the conditioning of that air by control of temperatures, and to a lesser degree humidity, dust and odors. The equipment as a whole functions to provide comfort air conditioning in a broad sense for the occupants of the school building. From a functional point of view, the work is appropriately allocated to the heating and ventilating category.
It is further noted that the statute under consideration refers to "steam and hot water heating and ventilating apparatus, steam power plants and all work kindred thereto" (emphasis supplied); whereas the clause "electrical work" in the statute is not followed by any such enlarging clause. Thus, it may be argued that it was the legislative intent perhaps to enlarge upon the heating and ventilating category, whereas no such intention is manifest in connection with electrical work.
It is significant that counsel for the board urges that the heating and ventilating equipment is properly allocated in the amended specifications. The board, whose desire it is to have school construction accomplished in an efficient and economical manner, apparently is not concerned with the alleged division of responsibility under the amended specifications. It is to be further noted that the manufacturer of all of the equipment guarantees the units against defects, and that a one-year surety bond is required of the installer of the equipment. Moreover, division of responsibility certainly is not unique in school construction. The supply and installation of other electrically energized equipment, such as thermovents, TX Syncretizers, and kitchen equipment, concededly is not to be accomplished by the electrical contractor although he is to be responsible for the field wiring necessary to make that equipment functional. Division of responsibility *372 in those areas apparently is not a paramount concern of the board, the architects and engineers. The instant situation is hardly distinguishable.
While trade custom may be relevant in determining the meaning of statutory language, plaintiff can find no support in a custom or uniform practice, for the testimony of the experts indicates a divergency in the practice of categorizing the work and equipment in dispute.
In any event, plaintiff has not sustained the burden of proving that the furnishing and installation of the subject equipment constitutes "Electrical Work"; nor has he sustained the burden of proving that it would be economically advantageous to defendant to allocate the equipment and work in dispute to "Electrical Work." Nor has he sustained the burden of proving that competition would be encouraged by bidding under the original specifications. As already noted, all qualified contractors, be they heating or electrical, may bid for the proposed work under the revised specifications.
Finally, plaintiff has urged that since the units to be supplied produce heat through electric energy, they cannot be considered within that part of the statute requiring separate bids for the "steam and hot water heating." However, the shortcoming of plaintiff's argument becomes apparent when it is realized that the major work to be performed with regard to the supply and installation of the units is not electrical  thereby rendering it unamenable to that part of the statute which requires separate bids for the "Electrical Work." As already noted, the pre-packaged units perform a heating and ventilating function, and the predominant work required for installation is mechanical. Thus, as between the electrical work category and the steam and hot water heating and ventilating category, it appears that the supply and installation of the units may be properly allocated to the latter category. Certainly such allocation does not constitute an abuse of discretion by the board in its bona fide *373 effort to comply with the requirements of N.J.S.A. 18:11-10.
Accordingly, it is held that the board's action in amending the specifications for the new addition to Burnet Junior High School did not contravene the provisions of N.J.S.A. 18:11-10.